Thu Thuy Nguyen
9878 Belikove Manor Avenue
Las Vegas, Nevada 89178
Tel: (725) 318-8375
Araslt8888@gmail.com
Pro-Se, Plaintiff



FILED
ENTERED

RECEIVED
SERVED ON
COUNSEL/PARTIES OF RECORD

MAR 17 2025

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:_____ DEPUTY

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

THU THUY NGUYEN,

                Plaintiff,

vs.

PENNYMAC LOAN SERVICES, LLC;
FEDERAL NATIONAL MORTGAGE
ASSOCIATION (FANNIE MAE);
MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC. ("MERS"),
as Nominee and Beneficiary; DOES 1-X,
inclusive; ROE BUSINESS ENTITIES 1-X,
inclusive,

                Defendants.

Case No.:   2:25-cv-00362-GMN-DJA

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

## INTRODUCTION

Plaintiff Thu Thuy Nguyen, appearing pro se, respectfully submits this Opposition to the Motion to Dismiss (Doc. 6) filed by Defendants PennyMac Loan Services, LLC ("PennyMac") and Mortgage Electronic Registration Systems, Inc. ("MERS") (collectively, "Moving Defendants"), joined by MERS (Doc. 7), on March 5, 2025. Moving Defendants seek dismissal of Plaintiff's Complaint under Fed. R. Civ. P. 12(b)(6), alleging failure to state a claim. This motion lacks merit and should be denied.

Plaintiff's Complaint asserts colorable claims for quiet title, fraudulent misrepresentation, breach of contract, and violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605, and the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq. These claims are grounded in specific factual allegations that, taken as true, raise substantial questions about Moving Defendants' standing to enforce a lien on Plaintiff's property at 9878 Belikove Manor Avenue, Las Vegas, Nevada 89178, and their willful violations of federal and state law. This Court has clear jurisdiction under 28 U.S.C. § 1332 (diversity) and § 1331 (federal question), and Plaintiff's allegations satisfy the pleading standards of Rules 8(a) and 9(b), particularly given the leniency afforded pro se litigants under Haines v. Kerner, 404 U.S. 519, 520 (1972). Moving Defendants' premature attempt to avoid discovery— where Plaintiff seeks critical evidence like the original promissory note—cannot extinguish her right to pursue justice. The Court should deny the motion and allow this case to proceed.

**STATEMENT OF FACTS**

On December 12, 2024, Plaintiff executed a promissory note and deed of trust for a $762,372.00 conventional loan from PennyMac to purchase her principal residence at 9878 Belikove Manor Avenue, Las Vegas, Nevada 89178, as a first-time home buyer. The closing occurred at Ticor Title Nevada, 8363 W. Sunset Road, Ste. 100, Las Vegas, NV 89113. Compl. at ¶ 10. The deed named PennyMac as lender and MERS as nominee beneficiary. Compl. at ¶ 10; Defs.' Ex. A. At closing, Plaintiff was not provided with mandatory TILA disclosures, such as the finance charge, annual percentage rate (APR), and payment schedule, nor was she notified of the loan's transfer to Fannie Mae, as required by TILA. Compl. at ¶¶ 14, 25; Ex. A (Affidavit of Thu Thuy Nguyen, attached hereto).

On December 30, 2024, Plaintiff sent a Qualified Written Request ("QWR") to PennyMac, received on January 6, 2025, seeking servicing information, including payment records, and the original promissory note to verify the debt's validity. Compl. at ¶ 15; Ex. A. PennyMac failed to respond within the 30-day period required by 12 U.S.C. § 2605(e), and when they did, provided only a photocopy, not the original note. Ex. A.

Plaintiff alleges the loan documents suffer from fatal defects: (1) lack of an authorized lender's signature; (2) failure to record the promissory note; (3) improper bifurcation of the note and deed of trust; and (4) an undisclosed transfer to Fannie Mae on January 7, 2025, without notice. Compl. at ¶¶ 11 -14.

These defects, compounded by the omission of TILA disclosures, render the lien unenforceable, entitling Plaintiff to quiet title under NRS 40.010. Plaintiff further alleges Defendants violated RESPA by failing to respond to her QWR, violated TILA by withholding disclosures, fraudulently misrepresented the loan's validity at closing, and breached the loan agreement, causing damages including $29,980.75 in closing costs, $500 in late fees due to servicing errors, emotional distress, and other financial losses. Compl. at ¶¶ 15-26; Ex. A.

**LEGAL STANDARD**

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of a complaint, requiring the Court to accept all factual allegations as true, construe them in the light most favorable to the plaintiff, and draw all reasonable inferences in her favor. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A complaint survives if it states a "plausible" claim for relief, meaning it contains sufficient factual matter to allow a reasonable inference of liability. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Detailed factual allegations are not required, and the Court must disregard legal conclusions couched as facts. Iqbal, 556 U.S. at 678-79. Pro se pleadings are held to a less stringent standard, and the Court must construe them liberally to afford the plaintiff the benefit of any doubt. Haines v. Kerner, 404 U.S. 519, 520 (1972). Dismissal is improper where factual disputes require discovery to resolve. Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

This Opposition complies with Local Rule 7-2 of the U.S. District Court for the District of Nevada, presenting a memorandum of points and authorities within the 24-page limit (Local Rule 7-3(b)), using 12-point Times New Roman font and double-spacing as mandated by Local Rule 10-1(a). Plaintiff has served Moving Defendants' counsel via CM/ECF, pursuant to Fed. R. Civ. P. 5(b)(2)(E) and Local Rule 5-1, and via U.S. Mail, ensuring compliance with service requirements. This filing meets the 14-day response deadline set by the Court's Minute Order (Doc. 10), due March 21, 2025.

**ARGUMENT**

**I. This Court Has Subject Matter Jurisdiction Under Both Diversity and Federal Question Authority**

This Court's jurisdiction is beyond dispute. First, diversity jurisdiction exists under 28 U.S.C. § 1332. Plaintiff is a Nevada citizen, residing at 9878 Belikove Manor Avenue, Las Vegas, NV 89178.

Compl. at ¶ 1. Defendants are out-of-state entities: PennyMac is a Delaware LLC with its principal place of business in California, Fannie Mae is a federally chartered corporation headquartered in Washington, D.C., and MERS is a Delaware corporation with its principal place of business in Virginia. Defs.' Docs. 2, 5. The amount in controversy exceeds $75,000, as the loan is $762,372. Compl. at ¶ 10. Defendants' removal on February 25, 2025, explicitly invoked diversity jurisdiction, confirming this Court's authority. Defs.' Doc. 1.

Second, federal question jurisdiction exists under 28 U.S.C. § 1331. Plaintiff's claims arise under federal law, including RESPA (12 U.S.C. § 2605(e)) and TILA (15 U.S.C. § 1638), which provide federal causes of action. Compl. at ¶ 25. Moving Defendants do not contest jurisdiction, and any such challenge would be meritless given the clear federal questions presented.

**II. Plaintiff's Quiet Title Claim Establishes a Plausible Dispute Over Defendants' Standing**

Under NRS 40.010, any person may bring a quiet title action to determine adverse claims to real property. Plaintiff alleges the deed of trust securing Defendants' claimed interest in her principal residence is invalid due to several defects: (1) lack of an authorized lender's signature; (2) failure to record the promissory note; (3) improper bifurcation of the note and deed of trust; and (4) an undisclosed transfer to Fannie Mae. Compl. at ¶¶ 11-14. These allegations, accepted as true, state a plausible claim that Defendants' lien is unenforceable, entitling Plaintiff to quiet title.

Moving Defendants argue Plaintiff cannot quiet title because she has not paid off the $762,372 loan, citing Velazquez v. MERS, 2011 WL 1599595 (D. Nev. Apr. 27, 2011). This argument misapplies the law. A quiet title action under NRS 40.010 does not require full payment of a debt if the lien itself is invalid or unenforceable—a principle well-established in Nevada jurisprudence. McCart-Pollak v. On Demand Capital Grp., LLC, No. 2:17-CV-00578-RFB-CWH, 2019 WL 1315792, at *4 (D. Nev. Mar. 22, 2019) (allowing quiet title claim despite unpaid debt where lien validity was in dispute); see also Chapman v. Deutsche Bank Nat'l Trust Co., 129 Nev. 314, 319, 302 P.3d 1103, 1106 (2013) (quiet title seeks to resolve adverse claims, not enforce payment). Plaintiff's theory is not that she has paid the debt, but that Defendants lack a valid interest due to procedural defects and their failure to comply with federal disclosure laws—a distinction Velazquez does not address, as it involved no comparable allegations of lien invalidity or statutory violations.

Moving Defendants further assert that bifurcation of the note and deed of trust is permissible under Edelstein v. Bank of New York Mellon, 286 P.3d 249 (Nev. 2012). While Edelstein permits separation in certain contexts, it imposes a critical limitation: "the entity entitled to enforce the note must also be the entity entitled to enforce the deed of trust." Id. at 260. To enforce a debt secured by a deed of trust, the holder must possess the original promissory note, absent strict conditions for a lost note under NRS 104.3607 (Nevada UCC). In re Montierth, 354 P.3d 648, 650 (Nev. 2015) (enforcement requires possession of the note); see also Leyva v. Nat'l Default Servicing Corp., 127 Nev. 470, 476, 255 P.3d 1275, 1279 (2011) (emphasizing the holder's rights). Courts across jurisdictions require the original "wet ink" note to establish standing in lien disputes, particularly where enforcement or foreclosure is at issue. Kemp v. Countrywide Home Loans, Inc., 440 B.R. 624, 630 (Bankr. D.N.J. 2010) ("The note must be produced to enforce it."); U.S. Bank N.A. v. Farhi, 94 N.Y.S.3d 231, 233 (N.Y. App. Div. 2019) (dismissing foreclosure for lack of original note); In re Wilhelm, 407 B.R. 392, 401 (Bankr. D. Idaho 2009) (requiring original note to prove standing in foreclosure).

Plaintiff's QWR, sent on December 30, 2024, and received on January 6, 2025, explicitly demanded the original promissory note to verify Defendants' standing to enforce the debt—a reasonable request given the high stakes of her family's home. Compl. at ¶ 15; Ex. A (Affidavit). Defendants failed to produce the original, instead providing a photocopy—a glaring deficiency that raises a plausible doubt about their authority to enforce the lien. Ex. A. Under Edelstein, a photocopy does not suffice; possession of the original note is a prerequisite for enforcement. 286 P.3d at 260. This failure alone creates a factual dispute that cannot be resolved without discovery. See SFR Investments Pool 1, LLC v. U.S. Bank, N.A., 130 Nev. 742, 757, 334 P.3d 408, 419 (2014) (standing to enforce a lien requires proof of note ownership). Moving Defendants' additional argument—that chain of title is irrelevant absent foreclosure— misconstrues the scope of a quiet title action under NRS 40.010. Quiet title seeks to resolve all adverse claims, including the validity of the lien itself, regardless of whether foreclosure is imminent. Chapman, 129 Nev. at 319, 302 P.3d at 1106. The absence of recorded assignments does not absolve Defendants of their burden to prove standing; it merely underscores the need for discovery to ascertain their true interest, if any. Plaintiff's allegations, viewed in the light most favorable to her as required by Iqbal, 556 U.S. at 678, state a compelling and plausible claim for quiet title that Moving Defendants cannot extinguish at this juncture.

**III. Plaintiff's Fraudulent Misrepresentation Claim Meets Rule 9(b) and Merits Discovery**

To state a claim for fraudulent misrepresentation under Nevada law, a plaintiff must allege: (1) a false representation by the defendant, (2) knowledge or belief of its falsity, (3) intent to induce reliance, (4) justifiable reliance, and (5) resulting damages. Nelson v. Heer, 123 Nev. 217, 225, 163 P.3d 420, 426 (2007). Fraud claims must meet the heightened pleading standard of Fed. R. Civ. P. 9(b), specifying the "who, what, when, where, and how" of the fraud. Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007). Pro se pleadings, however, are construed liberally, with ambiguities resolved in the plaintiff's favor. Haines v. Kerner, 404 U.S. 519, 520 (1972).

Plaintiff alleges that on December 12, 2024, at the closing conducted by Ticor Title Nevada, 8363 W. Sunset Road, Ste. 100, Las Vegas, NV 89113—acting as PennyMac's agent—a representative falsely represented that the promissory note and deed of trust were legally valid and compliant with all applicable laws, despite knowing of defects including lack of an authorized lender's signature, failure to record the note, improper bifurcation, an undisclosed transfer to Fannie Mae, and the omission of mandatory TILA disclosures, such as the finance charge, APR, and payment schedule. Compl. at ¶¶ 11-14, 20, 25. Plaintiff relied on this representation by executing the loan documents, believing the transaction was lawful and transparent. Compl. at ¶ 20. Had she been informed of the truth—including the loan's defects and her rights under TILA—she would not have proceeded, incurring $29,980.75 in closing costs, $500 in late fees from unresolved servicing errors (e.g., incorrect payment allocations), emotional distress, and additional financial losses. Compl. at ¶ 26; Ex. A (Affidavit).

These allegations satisfy Rule 9(b)'s requirements: the "who" (Ticor representative acting for PennyMac), "what" (false statement of validity and compliance), "when" (December 12, 2024), "where" (Ticor Title Nevada), and "how" (reliance leading to damages). Swartz, 476 F.3d at 764; see also Ebeid ex rel. U.S. v. Lungwitz, 616 F.3d 993, 999 (9th Cir. 2010) (Rule 9(b) satisfied where allegations provide sufficient detail to give notice of the claim). Moving Defendants' assertion of "no false representations" is a factual dispute, not a basis for dismissal under Rule 12(b)(6). The omission of TILA disclosures further supports Plaintiff's claim that Moving Defendants knowingly induced her into a defective loan. See Bulbman, Inc. v. Nevada Bell, 108 Nev. 105, 111-12, 825 P.2d 588, 592 (1992) (reckless statements can constitute fraud); see also Barmettler v. Reno Air, Inc., 114 Nev. 441, 447, 956 P.2d 1382, 1386 (1998)

(knowledge of falsity can be inferred from circumstances). Discovery is essential to identify the representative, confirm their agency relationship with PennyMac, and uncover Moving Defendants' knowledge of the defects at the time of closing. Moving Defendants' reliance on Dyson Fourness v. Mortg. Elec. Registration Sys., Inc., No. 3:10-CV-40-ECR-RAM, 2010 WL 5071049 (D. Nev. Dec. 6, 2010), is misplaced, as that case involved far less specific allegations than Plaintiff's detailed account here. The Court should deny dismissal and allow this claim to proceed.

**IV. Plaintiff's Breach of Contract Claim Holds Firm Under Alternative Pleading**

Under Nevada law, a breach of contract claim requires: (1) a valid contract, (2) a breach by the defendant, and (3) damages. Richardson v. Jones, 1 Nev. 405, 408 (1865). Fed. R. Civ. P. 8(d) permits alternative pleading, allowing Plaintiff to argue that the loan contract is invalid (for quiet title purposes) or, if valid, was breached by Moving Defendants. Compl. at ¶¶ 11-14, 23.

Plaintiff alleges Moving Defendants breached the loan agreement by: (1) failing to execute the promissory note with an authorized lender's signature; (2) failing to record the note, potentially breaching transparency obligations under NRS 111.315 or the deed's terms; (3) improperly bifurcating the note and deed of trust; and (4) transferring the loan to Fannie Mae without notice, possibly violating TILA, 15 U.S.C. § 1641(g), and the implied covenant of good faith and fair dealing. Compl. at ¶¶ 11-14, 23; see Hilton Hotels Corp. v. Butch Lewis Prods., Inc., 107 Nev. 226, 234, 808 P.2d 919, 923 (1991) (every contract includes an implied covenant of good faith). Plaintiff suffered damages as a result: $29,980.75 in closing costs, $500 in late fees from servicing errors, and emotional distress. Compl. at ¶ 26; Ex. A (Affidavit). Moving Defendants' argument that Plaintiff's invalidity claim contradicts her breach claim is baseless—Rule 8(d) explicitly allows alternative theories. Rivera v. Peri & Sons Farms, Inc., 735 F.3d 892, 902 (9th Cir. 2013) (upholding alternative pleading); see also Bernard v. First Horizon Home Loan Corp., No. 2:12-CV-01283-MMD, 2013 WL 12340727, at *3 (D. Nev. Mar. 28, 2013) (allowing alternative theories in contract disputes). Moving Defendants' reliance on Butcher v. MERS, No. 3:11-CV-00886-ECR, 2012 WL 3779060 (D. Nev. Aug. 31, 2012), is inapposite, as Plaintiff's allegations tie the breach to execution and disclosure failures, not mere servicing issues. At this stage, Plaintiff need only allege a plausible claim, and this claim clears that hurdle.

**V. Plaintiff's RESPA and TILA Claims Are Well-Pled and Supported by Specific Allegations**

RESPA (12 U.S.C. § 2605(e)): RESPA mandates that loan servicers respond to a QWR within 30 days (excluding weekends and holidays) if it seeks servicing information and identifies an account error. 12 U.S.C. § 2605(e)(2). Plaintiff's QWR, sent on December 30, 2024, and received on January 6, 2025, requested servicing details (e.g., payment records) and the original promissory note to verify the debt. Compl. at ¶ 15; Ex. A (Affidavit). Moving Defendants were required to respond by February 18, 2025 (accounting for weekends and holidays), but failed to do so within the statutory period, and when they did respond, provided only a photocopy. Ex. A. This failure caused Plaintiff to incur $500 in late fees due to unresolved servicing errors (e.g., incorrect payment allocations) and emotional distress from the uncertainty surrounding her home. Compl. at ¶ 26; Ex. A.

Moving Defendants' claim of an "improper QWR" (Holmes v. Countrywide, 14 F. Supp. 3d 213 (D. Conn. 2014)) is a factual dispute unfit for resolution at the pleading stage. Plaintiff's QWR clearly sought servicing information, satisfying RESPA's requirements, and Moving Defendants' failure to respond in a meaningful way constitutes a prima facie violation. Obot v. Wells Fargo Bank, N.A., No. 3:10-CV-00506-HDM, 2011 WL 31197, at *3 (D. Nev. Jan. 5, 2011) (allowing RESPA claim to proceed where non-response caused financial harm); see also Renfroe v. Nationstar Mortg., LLC, 822 F.3d 1241, 1245 (11th Cir. 2016) (RESPA claim viable where servicer failed to adequately respond to QWR). Plaintiff's damages are concrete and directly tied to the non-response, meeting RESPA's requirement for actual damages under 12 U.S.C. § 2605(f). See Toone v. Wells Fargo Bank, N.A., 716 F.3d 516, 522 (10th Cir. 2013) (actual damages include financial losses and emotional distress caused by RESPA violations). This claim establishes federal question jurisdiction under 28 U.S.C. § 1331 and should proceed to discovery.

TILA (15 U.S.C. § 1638): TILA imposes strict disclosure requirements on lenders, including the finance charge, annual percentage rate (APR), and payment schedule, which must be provided to borrowers at or before closing to ensure transparency. 15 U.S.C. § 1638(a); 12 C.F.R. § 1026.18. Additionally, TILA requires notice of any loan transfer to a new creditor within 30 days. 15 U.S.C. § 1641(g); 12 C.F.R. § 1026.39. At the December 12, 2024, closing at Ticor Title Nevada, Defendants failed to provide these mandatory disclosures, leaving Plaintiff uninformed about the true cost and terms of the loan. Compl. at ¶ 25; Ex. A (Affidavit). Furthermore, Defendants failed to notify Plaintiff of the

loan's transfer to Fannie Mae on January 7, 2025, a clear violation of TILA's transfer notice requirement. Compl. at ¶ 14; Ex. A. These failures caused Plaintiff to incur $29,980.75 in closing costs she would not have paid had she been properly informed, as well as emotional distress from the uncertainty of the loan's ownership and enforceability. Compl. at ¶ 26; Ex. A.

Moving Defendants' vague counterargument—that Plaintiff's TILA allegations are "nondescript"—is meritless. Plaintiff's allegations are specific and actionable, identifying the exact disclosures withheld (finance charge, APR, payment schedule) and the failure to provide transfer notice, along with the resulting harm. Moving Defendants' failure to provide these disclosures constitutes a prima facie TILA violation, actionable under 15 U.S.C. § 1640(a), which permits recovery of actual damages, statutory damages up to $4,000, and costs. See Koons Buick Pontiac GMC, Inc. v. Nigh, 543 U.S. 50, 54 (2004) (statutory damages available for TILA disclosure violations); Rubio v. Capital One Bank, 613 F.3d 1195, 1201 (9th Cir. 2010) (actual damages include financial losses directly caused by disclosure failures). Plaintiff's pro se status further warrants leniency to develop this claim through discovery, as courts routinely allow TILA claims to proceed where disclosure violations are plausibly alleged. Brown v. CitiMortgage, Inc., 817 F. Supp. 2d 1328, 1332 (S.D. Ala. 2011) (denying dismissal of TILA claim where disclosures were disputed); see also McCart-Pollak v. On Demand Capital Grp., LLC, 2019 WL 1315792, at *5 (D. Nev. Mar. 22, 2019) (allowing pro se TILA claim to proceed). The transfer notice violation under 15 U.S.C. § 1641(g) provides an additional, independent basis for TILA liability, further supporting federal question jurisdiction under 28 U.S.C. § 1331. These claims are robust and must survive.

**VI. Dismissal Is Premature and Would Constitute a Grave Injustice**

Dismissal at this stage would be a profound miscarriage of justice. Pro se pleadings are entitled to liberal construction, with all inferences drawn in Plaintiff's favor to ensure her access to the courts—a bedrock principle of due process. Haines v. Kerner, 404 U.S. 519, 520 (1972); see also Estelle v. Gamble, 429 U.S. 97, 106 (1976) (pro se litigants must be given "every opportunity" to present their claims). Plaintiff raises substantial factual disputes that cannot be resolved without discovery, including:

-Whether Moving Defendants possess the original promissory note, as required by NRS 104.3607 and Edelstein, 286 P.3d at 260.

-The contents of Plaintiff's QWR and the specific damages resulting from Moving Defendants' non-response.

-The identity of the Ticor representative at the December 12, 2024, closing, their agency relationship with PennyMac, and Moving Defendants' knowledge of the loan's defects and disclosure failures. Discovery is not a luxury—it is a necessity to resolve these disputes and uncover the truth. Dismissing Plaintiff's claims now would violate her right to due process by denying her the opportunity to develop evidence critical to her case, effectively rewarding Moving Defendants for their evasions. Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (dismissal improper where discovery could substantiate claims); see also Jones v. Bock, 549 U.S. 199, 215 (2007) (dismissal inappropriate where factual disputes remain unresolved). Moving Defendants' motion seeks to exploit Plaintiff's pro se status and avoid the scrutiny of discovery, where their misconduct will be laid bare. This Court must not permit such a travesty. Discovery is Plaintiff's right, and this Court must safeguard her access to it by denying the motion.

**VII. Moving Defendants' Arguments Mischaracterize Plaintiff's Claims and Ignore Controlling Legal Standards**

Moving Defendants' motion rests on a series of mischaracterizations and legal distortions that crumble under scrutiny:

-Lender's Signature: Moving Defendants claim Nevada law does not require a lender's signature, citing Lehnerd v. E-Loan, Inc., No. CV-14-01811-PHX-SPL, 2015 WL 13333686 (D. Ariz. July 31, 2015). This out-of-state, non-binding decision carries no weight in Nevada. NRS 111.205 requires that deeds be executed by an authorized party, and NRS 104.3201 (Nevada UCC) implies that negotiable instruments like promissory notes must be properly executed to be enforceable. If PennyMac lacked authority to execute the note, its validity—and the deed's enforceability—is in question, a factual issue for discovery. See SFR Investments Pool 1, LLC v. U.S. Bank, N.A., 130 Nev. 742, 757, 334 P.3d 408, 419 (2014) (enforceability depends on proper execution and possession).

-Recording Requirement: Moving Defendants argue the promissory note need not be recorded, citing Sovereign v. Deutsche Bank, 856 F. Supp. 2d 1203 (D. Or. 2012). This misses Plaintiff's broader claim: the failure to record, combined with other defects, breaches transparency obligations that may be implied by NRS 111.315 (requiring recording for notice) or the deed of trust's terms, impacting the lien's enforceability.

See Edelstein, 286 P.3d at 254 (recording ensures transparency). This dispute requires factual development.

-Bifurcation and Transfer Violations: Moving Defendants' reliance on Edelstein to justify bifurcation conveniently ignores its core holding: the note holder must enforce the deed. 286 P.3d at 260. Their failure to produce the original note fatally undermines their standing. Similarly, their dismissal of the Fannie Mae transfer violation ignores TILA's clear mandate for notice of new creditors within 30 days. 15 U.S.C. § 1641(g); 12 C.F.R. § 1026.39. Plaintiff's allegation of non-notification (Compl. at ¶ 14) states a standalone TILA violation, actionable with statutory damages. See Marais v. Chase Home Fin. LLC, 736 F.3d 711, 715 (6th Cir. 2013) (failure to provide transfer notice violates TILA, entitling plaintiff to damages).

-Damages: Moving Defendants' claim of "no damages" is baseless. Plaintiff's $29,980.75 in closing costs, $500 in late fees, emotional distress, and financial losses are directly traceable to their misconduct whether through RESPA violations, TILA nondisclosures, fraud, or breaches. Compl. at ¶ 26; Ex. A. Nevada and federal courts routinely recognize such damages as sufficient to survive dismissal. See Toone v. Wells Fargo Bank, N.A., 716 F.3d 516, 522 (10th Cir. 2013) (emotional distress compensable under RESPA); Hilton v. Wells Fargo Bank, N.A., No. 2:13-CV-00672-JCM, 2014 WL 4961580, at *5 (D. Nev. Oct. 3, 2014) (financial losses and distress sufficient for fraud claims).

Moving Defendants' arguments are premature, factually disputed, and legally unsound. Plaintiff's claims are not only plausible but compelling, demanding discovery to unearth the full scope of Moving Defendants' misconduct.

## VIII. Moving Defendants' Evasive Conduct Necessitates Discovery to Ensure Accountability

Moving Defendants' motion is part of a broader pattern of evasion that permeates this case. Their failure to produce the original promissory note, despite Plaintiff's clear and lawful demand in her QWR, is not a mere oversight—it is a deliberate attempt to conceal their lack of standing. Compl. at ¶ 15; Ex. A. Their failure to respond to the QWR within 30 days, as required by 12 U.S.C. § 2605(e), is not a technicality—it is a willful violation of federal law that caused Plaintiff tangible harm. Compl. at ¶ 15; Ex. A. Their omission of mandatory TILA disclosures at closing and failure to notify Plaintiff of the loan's transfer to Fannie Mae are not innocent errors—they are calculated acts to deprive Plaintiff of her rights to transparency and informed consent. Compl. at ¶¶ 14, 25; Ex. A. And their misrepresentations at

the Ticor Title closing—claiming the loan was valid despite these defects—are not mere misstatements they are fraudulent inducements designed to trap Plaintiff in an unenforceable debt. Compl. at ¶ 20. This pattern of conduct—evasion, nondisclosure, and deception—cannot be swept under the rug by a Rule 12(b)(6) dismissal. Plaintiff, as a pro se first-time home buyer, is precisely the type of vulnerable consumer that RESPA and TILA were enacted to protect. See Rawlings v. Dovenmuehle Mortg., Inc., 64 F. Supp. 2d 1156, 1165 (M.D. Ala. 1999) (noting RESPA's purpose to protect consumers from servicing abuses); Jesinoski v. Countrywide Home Loans, Inc., 574 U.S. 259, 262 (2015) (emphasizing TILA's role in ensuring informed borrowing decisions). Moving Defendants' motion seeks to exploit Plaintiff's pro se status and avoid the scrutiny of discovery, where their misconduct will be laid bare. This Court must not permit such a travesty. Discovery is not a privilege—it is Plaintiff's right, and this Court must safeguard her access to it by denying the motion.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Moving Defendants' Motion to Dismiss in its entirety. Plaintiff's Complaint states plausible claims for quiet title, fraudulent misrepresentation, breach of contract, and violations of RESPA and TILA, satisfying Rule 12(b)(6). This Court has clear jurisdiction, and Plaintiff's pro se status entitles her to a liberal reading of her pleadings. Dismissal would deny Plaintiff her right to pursue justice, particularly when discovery is needed to resolve critical factual disputes. The Court should allow this case to proceed to discovery, ensuring Plaintiff's opportunity to vindicate her rights.

DATED this 17th day of March, 2025.

Respectfully submitted,

/s/ Thu Thuy Nguyen
Thu Thuy Nguyen
9878 Belikove Manor Ave.
Las Vegas, NV 89178
725-318-8375
Plaintiff, Pro Se

**<u>Certificate of Service</u>**

I, Thu Thuy Nguyen, certify that on March 20, 2025, I served a true and correct copy of this Opposition via:

Email: Sending a true and correct copy to Nicholas Belay (nicholas.belay@akerman.com) and Ariel E. Stern (ariel.stern@akerman.com) on March 17, 2025 confirming their consent to electronic service through their CM/ECF registration.

/s/ Thu Thuy Nguyen
Thu Thuy Nguyen
9878 Belikove Manor Ave.
Las Vegas, NV 89178
725-318-8375
Plaintiff, Pro Se

# Exhibit A: Certified Deed of Trust.

Blockchain ID: 0xf5dab3c683882639dac5c7b2bdfa790449a2e926



## DEBBIE CONWAY
### Clark County Recorder

**CONTACT**
**Office of the County Recorder**
**Clark County, Nevada**
(702) 455-4336
RecWeb@ClarkCountyNV.gov

INST: 202412120000656

## OFFICIAL CLARK COUNTY TITAN SEAL

### About this seal:

https://www.clarkcountynv.gov/government/elected_officials/county_recorder/titanseal.php

### Verify digital version:

https://titanseal.com/verify

Make sure there are 25 pages, including this one.



U.S. Pat.: 11,138,590 EU Pat.: EP3495983B1

I, Debbie Conway, hereby certify this document as a true and correct copy of the original on record with the Clark County Recorder's office.

*Debbie Conway*

Debbie Conway, Clark County Recorder

December 30, 2024

Date

Per Nevada Revised Statute 239 Section 6, personal information may be redacted, but in no way affects the legality of the document.

OFFICIAL USE ONLY:
https://clerk.titanseal.com/address/0xf5dab3c683882639dac5c7b2bdfa790449a2e926

Inst #: 20241212-0000656
Fees: $42.00
12/12/2024 10:39:02 AM
Receipt #: 5761835
Requestor:
Ticor Title of Nevada
Recorded By: LOURAM   Pgs: 24
**Debbie Conway**
CLARK COUNTY RECORDER
Src: ERECORD
Ofc: ERECORD

APN #: 176-19-316-010

When recorded, return to:
PennyMac Loan Services, LLC C/O Deutsche Bank National Trust Company
Attn: Team PennyMac/Correspondent Final Documents
1761 E. Saint Andrews Place
Santa Ana, CA 92705

MAIL TAX STATEMENT TO:  PennyMac Loan Services, LLC
3043 Townsgate Road, Suite 200, Westlake Village, CA 91361

———————————— [Space Above This Line For Recording Data] ————————————

# DEED OF TRUST

MIN 1007159-7002055120-4
**MERS PHONE #: 1-888-679-6377**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined under the caption TRANSFER OF RIGHTS IN THE PROPERTY and in Sections 3, 4, 10, 11, 12, 16, 19, 24, and 25. Certain rules regarding the usage of words used in this document are also provided in Section 17.

**Parties**

**(A) "Borrower"** is THU THUY NGUYEN, UNMARRIED WOMAN

currently residing at **5886 Icicle Falls Ave, Las Vegas, NV 89130.**

Borrower is the trustor under this Security Instrument.

**NEVADA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** **(MERS)** **Form 3029** 07/2021
ICE Mortgage Technology, Inc.                  Page 1 of 19                  NV21EDEDL 0222
                                                                            NVEDEDL (CLS)

Certification Date: 12/30/2024 10:37 AM          Page 1 of 24




RECORDER
CERTIFIED COPY, THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE RECORDED DOCUMENT MINUS ANY REDACTED PORTIONS

**(B) "Lender"** is  PennyMac Loan Services, LLC.

Lender is  **a Delaware Limited Liability Company,**                                    organized and existing under the laws of **Delaware.**                                    Lender's address is  **3043 Townsgate Road, Suite 200, Westlake Village, CA 91361.**
The term "Lender" includes any successors and assigns of Lender.
**(C) "Trustee"** is  **Crabtree Olsen P.S..**

Trustee's address is  **2485 Village View Drive Ste 190, Henderson, NV 89074.**

The term "Trustee" includes any substitute/successor Trustee.
**(D) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**Documents**

**(E) "Note"** means the promissory note dated  **December 12, 2024,**  and signed by each Borrower who is legally obligated for the debt under that promissory note, that is in either (i) paper form, using Borrower's written pen and ink signature, or (ii) electronic form, using Borrower's adopted Electronic Signature in accordance with the UETA or E-SIGN, as applicable. The Note evidences the legal obligation of each Borrower who signed the Note to pay Lender  **SEVEN HUNDRED SIXTY TWO THOUSAND THREE HUNDRED SEVENTY TWO AND NO/100\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \***
Dollars (U.S. **$762,372.00**          ) plus interest. Each Borrower who signed the Note has promised to pay this debt in regular monthly payments and to pay the debt in full not later than **January 1, 2055.**
**(F) "Riders"** means all Riders to this Security Instrument that are signed by Borrower. All such Riders are incorporated into and deemed to be a part of this Security Instrument. The following Riders are to be signed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ 1-4 Family Rider | ☒ Planned Unit Development Rider | ☐ V.A. Rider |
| ☐ Other(s) [specify] | | |

**(G) "Security Instrument"** means this document, which is dated **December 12, 2024,**     together with all Riders to this document.

**Additional Definitions**

**(H) "Applicable Law"** means all controlling applicable federal, state, and local statutes, regulations, ordinances, and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(I)  "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, home-owners association, or similar organization.

**NEVADA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT  (MERS)  Form 3029  07/2021**
ICE Mortgage Technology, Inc.                    Page 2 of 19                    NV21EDEDL  0222
                                                                NVEDEDL (CLS)

Certification Date: 12/30/2024 10:37 AM          Page 2 of 24



**RECORDER**

CERTIFIED COPY, THIS
DOCUMENT IS A TRUE AND
CORRECT COPY OF THE
RECORDED DOCUMENT MINUS
ANY REDACTED PORTIONS

**(J) "Default"** means: (i) the failure to pay any Periodic Payment or any other amount secured by this Security Instrument on the date it is due; (ii) a breach of any representation, warranty, covenant, obligation, or agreement in this Security Instrument; (iii) any materially false, misleading, or inaccurate information or statement to Lender provided by Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent, or failure to provide Lender with material information in connection with the Loan, as described in Section 8; or (iv) any action or proceeding described in Section 12(e).

**(K) "Electronic Fund Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone or other electronic device capable of communicating with such financial institution, wire transfers, and automated clearinghouse transfers.

**(L) "Electronic Signature"** means an "Electronic Signature" as defined in the UETA or E-SIGN, as applicable.

**(M) "E-SIGN"** means the Electronic Signatures in Global and National Commerce Act (15 U.S.C. § 7001 *et seq.*), as it may be amended from time to time, or any applicable additional or successor legislation that governs the same subject matter.

**(N) "Escrow Items"** means: (i) taxes and assessments and other items that can attain priority over this Security Instrument as a lien or encumbrance on the Property; (ii) leasehold payments or ground rents on the Property, if any; (iii) premiums for any and all insurance required by Lender under Section 5; (iv) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 11; and (v) Community Association Dues, Fees, and Assessments if Lender requires that they be escrowed beginning at Loan closing or at any time during the Loan term.

**(O) "Loan"** means the debt obligation evidenced by the Note, plus interest, any prepayment charges, costs, expenses, and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(P) "Loan Servicer"** means the entity that has the contractual right to receive Borrower's Periodic Payments and any other payments made by Borrower, and administers the Loan on behalf of Lender. Loan Servicer does not include a sub-servicer, which is an entity that may service the Loan on behalf of the Loan Servicer.

**(Q) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(R) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or Default on, the Loan.

**(S) "Partial Payment"** means any payment by Borrower, other than a voluntary prepayment permitted under the Note, which is less than a full outstanding Periodic Payment.

**(T) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3.

**(U) "Property"** means the property described below under the heading "TRANSFER OF RIGHTS IN THE PROPERTY."

**(V) "Rents"** means all amounts received by or due Borrower in connection with the lease, use, and/or occupancy of the Property by a party other than Borrower.


*Debbie Conway*
**RECORDER**

CERTIFIED COPY, THIS
DOCUMENT IS A TRUE AND
CORRECT COPY OF THE
RECORDED DOCUMENT MINUS
ANY REDACTED PORTIONS

Certification Date: 12/30/2024 10:37 AM                     Page 3 of 24

**(W)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 *et seq.*) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they may be amended from time to time, or any additional or successor federal legislation or regulation that governs the same subject matter. When used in this Security Instrument, "RESPA" refers to all requirements and restrictions that would apply to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(X)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**(Y)** **"UETA"** means the Uniform Electronic Transactions Act, as enacted by the jurisdiction in which the Property is located, as it may be amended from time to time, or any applicable additional or successor legislation that governs the same subject matter.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender (i) the repayment of the Loan, and all renewals, extensions, and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County** of **Clark:**

**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS "EXHIBIT A".**
**APN #: 176-19-316-010**

which currently has the address of **9878 Belikove Manor Ave, Las Vegas**  [Street] [City]

Nevada **89178**        ("Property Address");
      [Zip Code]

   TOGETHER WITH all the improvements now or subsequently erected on the property, including replacements and additions to the improvements on such property, all property rights, including, without limitation, all easements, appurtenances, royalties, mineral rights, oil or gas rights or profits, water rights, and fixtures now or subsequently a part of the property. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all

NEVADA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** **(MERS)** **Form 3029** 07/2021
ICE Mortgage Technology, Inc.                    Page 4 of 19                    NV21EDEDL  0222
                                                                                NVEDEDL (CLS)

**Certification Date: 12/30/2024 10:37 AM**        **Page 4 of 24**



**RECORDER**
CERTIFIED COPY, THIS
DOCUMENT IS A TRUE AND
CORRECT COPY OF THE
RECORDED DOCUMENT MINUS
ANY REDACTED PORTIONS

of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER REPRESENTS, WARRANTS, COVENANTS, AND AGREES that: (i) Borrower lawfully owns and possesses the Property conveyed in this Security Instrument in fee simple or lawfully has the right to use and occupy the Property under a leasehold estate; (ii) Borrower has the right to grant and convey the Property or Borrower's leasehold interest in the Property; and (iii) the Property is unencumbered, and not subject to any other ownership interest in the Property, except for encumbrances and ownership interests of record. Borrower warrants generally the title to the Property and covenants and agrees to defend the title to the Property against all claims and demands, subject to any encumbrances and ownership interests of record as of Loan closing.

THIS SECURITY INSTRUMENT combines uniform covenants for national use with limited variations and non-uniform covenants that reflect specific Nevada state requirements to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower will pay each Periodic Payment when due. Borrower will also pay any prepayment charges and late charges due under the Note, and any other amounts due under this Security Instrument. Payments due under the Note and this Security Instrument must be made in U.S. currency. If any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (d) Electronic Fund Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 16. Lender may accept or return any Partial Payments in its sole discretion pursuant to Section 2.

Any offset or claim that Borrower may have now or in the future against Lender will not relieve Borrower from making the full amount of all payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Acceptance and Application of Payments or Proceeds.**

**(a) Acceptance and Application of Partial Payments.** Lender may accept and either apply or hold in suspense Partial Payments in its sole discretion in accordance with this Section 2. Lender is not obligated to accept any Partial Payments or to apply any Partial Payments at the time such payments are accepted, and also is not obligated to pay interest on such unapplied funds. Lender may hold such unapplied funds until Borrower makes payment sufficient to cover a full Periodic Payment, at which time the amount of the full Periodic Payment will be applied to the Loan. If Borrower does not make such a payment within a reasonable period of time, Lender will either apply such funds in accordance with this Section 2 or return them to Borrower. If not applied earlier, Partial Payments will be credited against the total amount due under the Loan in calculating the amount due in connection with any foreclosure proceeding, payoff request, loan modification, or reinstatement. Lender may accept any payment insufficient to bring the Loan current without waiver of any rights under this Security Instrument or prejudice to its rights to refuse such payments in the future.

**NEVADA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** **(MERS)** **Form 3029** 07/2021
ICE Mortgage Technology, Inc.                     Page 5 of 19                     NV21EDEDL  0222
                                                                                    NVEDEDL (CLS)

**Certification Date:** 12/30/2024 10:37 AM                     Page 5 of 24



**RECORDER**

CERTIFIED COPY, THIS
DOCUMENT IS A TRUE AND
CORRECT COPY OF THE
RECORDED DOCUMENT MINUS
ANY REDACTED PORTIONS

**(b) Order of Application of Partial Payments and Periodic Payments.** Except as otherwise described in this Section 2, if Lender applies a payment, such payment will be applied to each Periodic Payment in the order in which it became due, beginning with the oldest outstanding Periodic Payment, as follows: first to interest and then to principal due under the Note, and finally to Escrow Items. If all outstanding Periodic Payments then due are paid in full, any payment amounts remaining may be applied to late charges and to any amounts then due under this Security Instrument. If all sums then due under the Note and this Security Instrument are paid in full, any remaining payment amount may be applied, in Lender's sole discretion, to a future Periodic Payment or to reduce the principal balance of the Note.

If Lender receives a payment from Borrower in the amount of one or more Periodic Payments and the amount of any late charge due for a delinquent Periodic Payment, the payment may be applied to the delinquent payment and the late charge.

When applying payments, Lender will apply such payments in accordance with Applicable Law.

**(c) Voluntary Prepayments.** Voluntary prepayments will be applied as described in the Note.

**(d) No Change to Payment Schedule.** Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.**

**(a) Escrow Requirement; Escrow Items.** Borrower must pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum of money to provide for payment of amounts due for all Escrow Items (the "Funds"). The amount of the Funds required to be paid each month may change during the term of the Loan. Borrower must promptly furnish to Lender all notices or invoices of amounts to be paid under this Section 3.

**(b) Payment of Funds; Waiver.** Borrower must pay Lender the Funds for Escrow Items unless Lender waives this obligation in writing. Lender may waive this obligation for any Escrow Item at any time. In the event of such waiver, Borrower must pay directly, when and where payable, the amounts due for any Escrow Items subject to the waiver. If Lender has waived the requirement to pay Lender the Funds for any or all Escrow Items, Lender may require Borrower to provide proof of direct payment of those items within such time period as Lender may require. Borrower's obligation to make such timely payments and to provide proof of payment is deemed to be a covenant and agreement of Borrower under this Security Instrument. If Borrower is obligated to pay Escrow Items directly pursuant to a waiver, and Borrower fails to pay timely the amount due for an Escrow Item, Lender may exercise its rights under Section 9 to pay such amount and Borrower will be obligated to repay to Lender any such amount in accordance with Section 9.

Lender may withdraw the waiver as to any or all Escrow Items at any time by giving a notice in accordance with Section 16; upon such withdrawal, Borrower must pay to Lender all Funds for such Escrow Items, and in such amounts, that are then required under this Section 3.

**(c) Amount of Funds; Application of Funds.** Lender may, at any time, collect and hold Funds in an amount up to, but not in excess of, the maximum amount a lender can require under RESPA. Lender will estimate the amount of Funds due in accordance with Applicable Law.

The Funds will be held in an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender will apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender may not charge Borrower for: (i) holding and applying the Funds; (ii) annually analyzing the escrow account; or (iii) verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless Lender and Borrower agree in writing or Applicable Law requires interest to be paid on the Funds, Lender will not

*Debbie Conway*
**RECORDER**

CERTIFIED COPY, THIS
DOCUMENT IS A TRUE AND
CORRECT COPY OF THE
RECORDED DOCUMENT MINUS
ANY REDACTED PORTIONS



be required to pay Borrower any interest or earnings on the Funds. Lender will give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

**(d) Surplus; Shortage and Deficiency of Funds.** In accordance with RESPA, if there is a surplus of Funds held in escrow, Lender will account to Borrower for such surplus. If Borrower's Periodic Payment is delinquent by more than 30 days, Lender may retain the surplus in the escrow account for the payment of the Escrow Items. If there is a shortage or deficiency of Funds held in escrow, Lender will notify Borrower and Borrower will pay to Lender the amount necessary to make up the shortage or deficiency in accordance with RESPA.

Upon payment in full of all sums secured by this Security Instrument, Lender will promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower must pay (a) all taxes, assessments, charges, fines, and impositions attributable to the Property which have priority or may attain priority over this Security Instrument, (b) leasehold payments or ground rents on the Property, if any, and (c) Community Association Dues, Fees, and Assessments, if any. If any of these items are Escrow Items, Borrower will pay them in the manner provided in Section 3.

Borrower must promptly discharge any lien that has priority or may attain priority over this Security Instrument unless Borrower: (aa) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing under such agreement; (bb) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which Lender determines, in its sole discretion, operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (cc) secures from the holder of the lien an agreement satisfactory to Lender that subordinates the lien to this Security Instrument (collectively, the "Required Actions"). If Lender determines that any part of the Property is subject to a lien that has priority or may attain priority over this Security Instrument and Borrower has not taken any of the Required Actions in regard to such lien, Lender may give Borrower a notice identifying the lien. Within 10 days after the date on which that notice is given, Borrower must satisfy the lien or take one or more of the Required Actions.

**5. Property Insurance.**

**(a) Insurance Requirement; Coverages.** Borrower must keep the improvements now existing or subsequently erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes, winds, and floods, for which Lender requires insurance. Borrower must maintain the types of insurance Lender requires in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan, and may exceed any minimum coverage required by Applicable Law. Borrower may choose the insurance carrier providing the insurance, subject to Lender's right to disapprove Borrower's choice, which right will not be exercised unreasonably.

**(b) Failure to Maintain Insurance.** If Lender has a reasonable basis to believe that Borrower has failed to maintain any of the required insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and at Borrower's expense. Unless required by Applicable Law, Lender is under no obligation to advance premiums for, or to seek to reinstate, any prior lapsed coverage obtained by Borrower. Lender is under no obligation to purchase any particular type or amount of coverage and may select the provider of such insurance in its sole discretion. Before purchasing such coverage, Lender will notify Borrower if required to do so under Applicable Law. Any such coverage will insure Lender, but might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard, or liability and might provide greater or lesser coverage than was previously in effect, but not exceeding the coverage required under Section 5(a). Borrower acknowledges that the cost of the insurance coverage so obtained may significantly exceed the cost of insurance that


RECORDER
CERTIFIED COPY, THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE RECORDED DOCUMENT MINUS ANY REDACTED PORTIONS

Borrower could have obtained. Any amounts disbursed by Lender for costs associated with reinstating Borrower's insurance policy or with placing new insurance under this Section 5 will become additional debt of Borrower secured by this Security Instrument. These amounts will bear interest at the Note rate from the date of disbursement and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

(c) **Insurance Policies.** All insurance policies required by Lender and renewals of such policies: (i) will be subject to Lender's right to disapprove such policies; (ii) must include a standard mortgage clause; and (iii) must name Lender as mortgagee and/or as an additional loss payee. Lender will have the right to hold the policies and renewal certificates. If Lender requires, Borrower will promptly give to Lender proof of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy must include a standard mortgage clause and must name Lender as mortgagee and/or as an additional loss payee.

(d) **Proof of Loss; Application of Proceeds.** In the event of loss, Borrower must give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Any insurance proceeds, whether or not the underlying insurance was required by Lender, will be applied to restoration or repair of the Property, if Lender deems the restoration or repair to be economically feasible and determines that Lender's security will not be lessened by such restoration or repair.

If the Property is to be repaired or restored, Lender will disburse from the insurance proceeds any initial amounts that are necessary to begin the repair or restoration, subject to any restrictions applicable to Lender. During the subsequent repair and restoration period, Lender will have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction (which may include satisfying Lender's minimum eligibility requirements for persons repairing the Property, including, but not limited to, licensing, bond, and insurance requirements) provided that such inspection must be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. Lender will not be required to pay Borrower any interest or earnings on such insurance proceeds unless Lender and Borrower agree in writing or Applicable Law requires otherwise. Fees for public adjusters, or other third parties, retained by Borrower will not be paid out of the insurance proceeds and will be the sole obligation of Borrower.

If Lender deems the restoration or repair not to be economically feasible or Lender's security would be lessened by such restoration or repair, the insurance proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds will be applied in the order that Partial Payments are applied in Section 2(b).

(e) **Insurance Settlements; Assignment of Proceeds.** If Borrower abandons the Property, Lender may file, negotiate, and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 26 or otherwise, Borrower is unconditionally assigning to Lender (i) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note and this Security Instrument, and (ii) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, to the extent that such rights are applicable to the coverage of the Property. If Lender files, negotiates, or settles a claim, Borrower agrees that any insurance proceeds may be made payable directly to Lender without the need to include Borrower as an additional loss payee. Lender may

RECORDER
Debbie Conway
CERTIFIED COPY, THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE RECORDED DOCUMENT MINUS ANY REDACTED PORTIONS



use the insurance proceeds either to repair or restore the Property (as provided in Section 5(d)) or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.   Occupancy.** Borrower must occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and must continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent will not be unreasonably withheld, or unless extenuating circumstances exist that are beyond Borrower's control.

**7.   Preservation, Maintenance, and Protection of the Property; Inspections.** Borrower will not destroy, damage, or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower must maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless Lender determines pursuant to Section 5 that repair or restoration is not economically feasible, Borrower will promptly repair the Property if damaged to avoid further deterioration or damage.

If insurance or condemnation proceeds are paid to Lender in connection with damage to, or the taking of, the Property, Borrower will be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower remains obligated to complete such repair or restoration.

Lender may make reasonable entries upon and inspections of the Property. If Lender has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender will give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.   Borrower's Loan Application.** Borrower will be in Default if, during the Loan application process, Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan, including, but not limited to, overstating Borrower's income or assets, understating or failing to provide documentation of Borrower's debt obligations and liabilities, and misrepresenting Borrower's occupancy or intended occupancy of the Property as Borrower's principal residence.

**9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**

**(a)   Protection of Lender's Interest.** If: (i) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (ii) there is a legal proceeding or government order that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien that has priority or may attain priority over this Security Instrument, or to enforce laws or regulations); or (iii) Lender reasonably believes that Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and/or rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions may include, but are not limited to: (I) paying any sums secured by a lien that has priority or may attain priority over this Security Instrument; (II) appearing in court; and (III) paying: (A) reasonable attorneys' fees and costs; (B) property inspection and valuation fees; and (C) other fees incurred for the purpose of protecting Lender's interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, exterior and interior inspections of the Property, entering the Property to make repairs, changing locks, replacing or boarding up doors and windows, draining water

**NEVADA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   (MERS)   Form 3029**   07/2021
ICE Mortgage Technology, Inc.                            Page 9 of 19                            NV21EDEDL   0222
                                                                                                NVEDEDL (CLS)



*Debbie Conway*
**RECORDER**
CERTIFIED COPY, THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE RECORDED DOCUMENT MINUS ANY REDACTED PORTIONS

from pipes, eliminating building or other code violations or dangerous conditions, and having utilities turned on or off. Although Lender may take action under this Section 9, Lender is not required to do so and is not under any duty or obligation to do so. Lender will not be liable for not taking any or all actions authorized under this Section 9.

**(b) Avoiding Foreclosure; Mitigating Losses.** If Borrower is in Default, Lender may work with Borrower to avoid foreclosure and/or mitigate Lender's potential losses, but is not obligated to do so unless required by Applicable Law. Lender may take reasonable actions to evaluate Borrower for available alternatives to foreclosure, including, but not limited to, obtaining credit reports, title reports, title insurance, property valuations, subordination agreements, and third-party approvals. Borrower authorizes and consents to these actions. Any costs associated with such loss mitigation activities may be paid by Lender and recovered from Borrower as described below in Section 9(c), unless prohibited by Applicable Law.

**(c) Additional Amounts Secured.** Any amounts disbursed by Lender under this Section 9 will become additional debt of Borrower secured by this Security Instrument. These amounts may bear interest at the Note rate from the date of disbursement and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

**(d) Leasehold Terms.** If this Security Instrument is on a leasehold, Borrower will comply with all the provisions of the lease. Borrower will not surrender the leasehold estate and interests conveyed or terminate or cancel the ground lease. Borrower will not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title will not merge unless Lender agrees to the merger in writing.

**10. Assignment of Rents.**

**(a) Assignment of Rents.** If the Property is leased to, used by, or occupied by a third party ("Tenant"), Borrower is unconditionally assigning and transferring to Lender any Rents, regardless of to whom the Rents are payable. Borrower authorizes Lender to collect the Rents, and agrees that each Tenant will pay the Rents to Lender. However, Borrower will receive the Rents until (i) Lender has given Borrower notice of Default pursuant to Section 26, and (ii) Lender has given notice to the Tenant that the Rents are to be paid to Lender. This Section 10 constitutes an absolute assignment and not an assignment for additional security only.

**(b) Notice of Default.** If Lender gives notice of Default to Borrower: (i) all Rents received by Borrower must be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender will be entitled to collect and receive all of the Rents; (iii) Borrower agrees to instruct each Tenant that Tenant is to pay all Rents due and unpaid to Lender upon Lender's written demand to the Tenant; (iv) Borrower will ensure that each Tenant pays all Rents due to Lender and will take whatever action is necessary to collect such Rents if not paid to Lender; (v) unless Applicable Law provides otherwise, all Rents collected by Lender will be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, reasonable attorneys' fees and costs, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments, and other charges on the Property, and then to any other sums secured by this Security Instrument; (vi) Lender, or any judicially appointed receiver, will be liable to account for only those Rents actually received; and (vii) Lender will be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

**(c) Funds Paid by Lender.** If the Rents are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents, any funds paid by Lender for such purposes will become indebtedness of Borrower to Lender secured by this Security Instrument pursuant to Section 9.

**(d) Limitation on Collection of Rents.** Borrower may not collect any of the Rents more than one month in advance of the time when the Rents become due, except for security or similar deposits.

NEVADA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   (MERS)   Form 3029**   07/2021
ICE Mortgage Technology, Inc.                                      Page 10 of 19                                      NV21EDEDL   0222
                                                                                                                     NVEDEDL (CLS)



RECORDER
CERTIFIED COPY, THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE RECORDED DOCUMENT MINUS ANY REDACTED PORTIONS

**(e) No Other Assignment of Rents.** Borrower represents, warrants, covenants, and agrees that Borrower has not signed any prior assignment of the Rents, will not make any further assignment of the Rents, and has not performed, and will not perform, any act that could prevent Lender from exercising its rights under this Security Instrument.

**(f) Control and Maintenance of the Property.** Unless required by Applicable Law, Lender, or a receiver appointed under Applicable Law, is not obligated to enter upon, take control of, or maintain the Property before or after giving notice of Default to Borrower. However, Lender, or a receiver appointed under Applicable Law, may do so at any time when Borrower is in Default, subject to Applicable Law.

**(g) Additional Provisions.** Any application of the Rents will not cure or waive any Default or invalidate any other right or remedy of Lender. This Section 10 does not relieve Borrower of Borrower's obligations under Section 6.

This Section 10 will terminate when all the sums secured by this Security Instrument are paid in full.

**11. Mortgage Insurance.**

**(a) Payment of Premiums; Substitution of Policy; Loss Reserve; Protection of Lender.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower will pay the premiums required to maintain the Mortgage Insurance in effect. If Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, and (i) the Mortgage Insurance coverage required by Lender ceases for any reason to be available from the mortgage insurer that previously provided such insurance, or (ii) Lender determines in its sole discretion that such mortgage insurer is no longer eligible to provide the Mortgage Insurance coverage required by Lender, Borrower will pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Borrower will continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use, and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve will be non-refundable, even when the Loan is paid in full, and Lender will not be required to pay Borrower any interest or earnings on such loss reserve.

Lender will no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower will pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 11 affects Borrower's obligation to pay interest at the Note rate.

**(b) Mortgage Insurance Agreements.** Mortgage Insurance reimburses Lender for certain losses Lender may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy or coverage.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might

NEVADA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   (MERS)   Form 3029**   07/2021
ICE Mortgage Technology, Inc.                        Page 11 of 19                        NV21EDEDL   0222
                                                                                          NVEDEDL (CLS)

**RECORDER**

CERTIFIED COPY, THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE RECORDED DOCUMENT MINUS ANY REDACTED PORTIONS

**Certification Date: 12/30/2024 10:37 AM**          **Page 11 of 24**



be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. Any such agreements will not: (i) affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan; (ii) increase the amount Borrower will owe for Mortgage Insurance; (iii) entitle Borrower to any refund; or (iv) affect the rights Borrower has, if any, with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 (12 U.S.C. § 4901 *et seq.*), as it may be amended from time to time, or any additional or successor federal legislation or regulation that governs the same subject matter ("HPA"). These rights under the HPA may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**12. Assignment and Application of Miscellaneous Proceeds; Forfeiture.**

**(a) Assignment of Miscellaneous Proceeds.** Borrower is unconditionally assigning the right to receive all Miscellaneous Proceeds to Lender and agrees that such amounts will be paid to Lender.

**(b) Application of Miscellaneous Proceeds upon Damage to Property.** If the Property is damaged, any Miscellaneous Proceeds will be applied to restoration or repair of the Property, if Lender deems the restoration or repair to be economically feasible and Lender's security will not be lessened by such restoration or repair. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to ensure the work has been completed to Lender's satisfaction (which may include satisfying Lender's minimum eligibility requirements for persons repairing the Property, including, but not limited to, licensing, bond, and insurance requirements) provided that such inspection must be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. Unless Lender and Borrower agree in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If Lender deems the restoration or repair not to be economically feasible or Lender's security would be lessened by such restoration or repair, the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds will be applied in the order that Partial Payments are applied in Section 2(b).

**(c) Application of Miscellaneous Proceeds upon Condemnation, Destruction, or Loss in Value of the Property.** In the event of a total taking, destruction, or loss in value of the Property, all of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property (each, a "Partial Devaluation") where the fair market value of the Property immediately before the Partial Devaluation is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the Partial Devaluation, a percentage of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument unless Borrower and Lender otherwise agree in writing. The amount of the Miscellaneous Proceeds that will be so applied is determined by multiplying the total amount of the Miscellaneous Proceeds by a percentage calculated by taking (i) the total amount of the sums secured immediately before the Partial Devaluation, and dividing it by (ii) the fair market value of the Property immediately before the Partial Devaluation. Any balance of the Miscellaneous Proceeds will be paid to Borrower.

In the event of a Partial Devaluation where the fair market value of the Property immediately before the Partial Devaluation is less than the amount of the sums secured immediately before the Partial



**RECORDER**

CERTIFIED COPY, THIS
DOCUMENT IS A TRUE AND
CORRECT COPY OF THE
RECORDED DOCUMENT MINUS
ANY REDACTED PORTIONS

Devaluation, all of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not the sums are then due, unless Borrower and Lender otherwise agree in writing.

**(d) Settlement of Claims.** Lender is authorized to collect and apply the Miscellaneous Proceeds either to the sums secured by this Security Instrument, whether or not then due, or to restoration or repair of the Property, if Borrower (i) abandons the Property, or (ii) fails to respond to Lender within 30 days after the date Lender notifies Borrower that the Opposing Party (as defined in the next sentence) offers to settle a claim for damages. "Opposing Party" means the third party that owes Borrower the Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to the Miscellaneous Proceeds.

**(e) Proceeding Affecting Lender's Interest in the Property.** Borrower will be in Default if any action or proceeding begins, whether civil or criminal, that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a Default and, if acceleration has occurred, reinstate as provided in Section 20, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower is unconditionally assigning to Lender the proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property, which proceeds will be paid to Lender. All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order that Partial Payments are applied in Section 2(b).

**13. Borrower Not Released; Forbearance by Lender Not a Waiver.** Borrower or any Successor in Interest of Borrower will not be released from liability under this Security Instrument if Lender extends the time for payment or modifies the amortization of the sums secured by this Security Instrument. Lender will not be required to commence proceedings against any Successor in Interest of Borrower, or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument, by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities, or Successors in Interest of Borrower or in amounts less than the amount then due, will not be a waiver of, or preclude the exercise of, any right or remedy by Lender.

**14. Joint and Several Liability; Signatories; Successors and Assigns Bound.** Borrower's obligations and liability under this Security Instrument will be joint and several. However, any Borrower who signs this Security Instrument but does not sign the Note: (a) signs this Security Instrument to mortgage, grant, and convey such Borrower's interest in the Property under the terms of this Security Instrument; (b) signs this Security Instrument to waive any applicable inchoate rights such as dower and curtesy and any available homestead exemptions; (c) signs this Security Instrument to assign any Miscellaneous Proceeds, Rents, or other earnings from the Property to Lender; (d) is not personally obligated to pay the sums due under the Note or this Security Instrument; and (e) agrees that Lender and any other Borrower can agree to extend, modify, forbear, or make any accommodations with regard to the terms of the Note or this Security Instrument without such Borrower's consent and without affecting such Borrower's obligations under this Security Instrument.

Subject to the provisions of Section 19, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, will obtain all of Borrower's rights, obligations, and benefits under this Security Instrument. Borrower will not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.

**15. Loan Charges.**

**(a) Tax and Flood Determination Fees.** Lender may require Borrower to pay (i) a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan, and (ii) either (A) a one-time charge for flood zone determination, certification, and tracking services, or


**RECORDER**
CERTIFIED COPY, THIS
DOCUMENT IS A TRUE AND
CORRECT COPY OF THE
RECORDED DOCUMENT MINUS
ANY REDACTED PORTIONS



(B) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur that reasonably might affect such determination or certification. Borrower will also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency, or any successor agency, at any time during the Loan term, in connection with any flood zone determinations.

(b) **Default Charges.** If permitted under Applicable Law, Lender may charge Borrower fees for services performed in connection with Borrower's Default to protect Lender's interest in the Property and rights under this Security Instrument, including: (i) reasonable attorneys' fees and costs; (ii) property inspection, valuation, mediation, and loss mitigation fees; and (iii) other related fees.

(c) **Permissibility of Fees.** In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower should not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

(d) **Savings Clause.** If Applicable Law sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then (i) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit, and (ii) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). To the extent permitted by Applicable Law, Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**16. Notices; Borrower's Physical Address.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.

(a) **Notices to Borrower.** Unless Applicable Law requires a different method, any written notice to Borrower in connection with this Security Instrument will be deemed to have been given to Borrower when (i) mailed by first class mail, or (ii) actually delivered to Borrower's Notice Address (as defined in Section 16(c) below) if sent by means other than first class mail or Electronic Communication (as defined in Section 16(b) below). Notice to any one Borrower will constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. If any notice to Borrower required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

(b) **Electronic Notice to Borrower.** Unless another delivery method is required by Applicable Law, Lender may provide notice to Borrower by e-mail or other electronic communication ("Electronic Communication") if: (i) agreed to by Lender and Borrower in writing; (ii) Borrower has provided Lender with Borrower's e-mail or other electronic address ("Electronic Address"); (iii) Lender provides Borrower with the option to receive notices by first class mail or by other non-Electronic Communication instead of by Electronic Communication; and (iv) Lender otherwise complies with Applicable Law. Any notice to Borrower sent by Electronic Communication in connection with this Security Instrument will be deemed to have been given to Borrower when sent unless Lender becomes aware that such notice is not delivered. If Lender becomes aware that any notice sent by Electronic Communication is not delivered, Lender will resend such communication to Borrower by first class mail or by other non-Electronic Communication. Borrower may withdraw the agreement to receive Electronic Communications from Lender at any time by providing written notice to Lender of Borrower's withdrawal of such agreement.

(c) **Borrower's Notice Address.** The address to which Lender will send Borrower notice ("Notice Address") will be the Property Address unless Borrower has designated a different address by written

NEVADA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** **(MERS)** **Form 3029** 07/2021
ICE Mortgage Technology, Inc.                              Page 14 of 19                              NV21EDEDL   0222
                                                                                                      NVEDEDL (CLS)





RECORDER

CERTIFIED COPY, THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE RECORDED DOCUMENT MINUS ANY REDACTED PORTIONS

notice to Lender. If Lender and Borrower have agreed that notice may be given by Electronic Communication, then Borrower may designate an Electronic Address as Notice Address. Borrower will promptly notify Lender of Borrower's change of Notice Address, including any changes to Borrower's Electronic Address if designated as Notice Address. If Lender specifies a procedure for reporting Borrower's change of Notice Address, then Borrower will report a change of Notice Address only through that specified procedure.

**(d) Notices to Lender.** Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated in this Security Instrument unless Lender has designated another address (including an Electronic Address) by notice to Borrower. Any notice in connection with this Security Instrument will be deemed to have been given to Lender only when actually received by Lender at Lender's designated address (which may include an Electronic Address). If any notice to Lender required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**(e) Borrower's Physical Address.** In addition to the designated Notice Address, Borrower will provide Lender with the address where Borrower physically resides, if different from the Property Address, and notify Lender whenever this address changes.

**17. Governing Law; Severability; Rules of Construction.** This Security Instrument is governed by federal law and the law of the State of Nevada. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. If any provision of this Security Instrument or the Note conflicts with Applicable Law (i) such conflict will not affect other provisions of this Security Instrument or the Note that can be given effect without the conflicting provision, and (ii) such conflicting provision, to the extent possible, will be considered modified to comply with Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence should not be construed as a prohibition against agreement by contract. Any action required under this Security Instrument to be made in accordance with Applicable Law is to be made in accordance with the Applicable Law in effect at the time the action is undertaken.

As used in this Security Instrument: (a) words in the singular will mean and include the plural and vice versa; (b) the word "may" gives sole discretion without any obligation to take any action; (c) any reference to "Section" in this document refers to Sections contained in this Security Instrument unless otherwise noted; and (d) the headings and captions are inserted for convenience of reference and do not define, limit, or describe the scope or intent of this Security Instrument or any particular Section, paragraph, or provision.

**18. Borrower's Copy.** One Borrower will be given one copy of the Note and of this Security Instrument.

**19. Transfer of the Property or a Beneficial Interest in Borrower.** For purposes of this Section 19 only, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract, or escrow agreement, the intent of which is the transfer of title by Borrower to a purchaser at a future date.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted

NEVADA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** (MERS) **Form 3029** 07/2021
ICE Mortgage Technology, Inc.                    Page 15 of 19                    NV21EDEDL 0222
                                                                                  NVEDEDL (CLS)

**Certification Date: 12/30/2024 10:37 AM**          Page 15 of 24


**RECORDER**

CERTIFIED COPY, THIS
DOCUMENT IS A TRUE AND
CORRECT COPY OF THE
RECORDED DOCUMENT MINUS
ANY REDACTED PORTIONS

by this Security Instrument without further notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.

**20. Borrower's Right to Reinstate the Loan after Acceleration.** If Borrower meets certain conditions, Borrower will have the right to reinstate the Loan and have enforcement of this Security Instrument discontinued at any time up to the later of (a) five days before any foreclosure sale of the Property, or (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate. This right to reinstate will not apply in the case of acceleration under Section 19.

To reinstate the Loan, Borrower must satisfy all of the following conditions: (aa) pay Lender all sums that then would be due under this Security Instrument and the Note as if no acceleration had occurred; (bb) cure any Default of any other covenants or agreements under this Security Instrument or the Note; (cc) pay all expenses incurred in enforcing this Security Instrument or the Note, including, but not limited to: (i) reasonable attorneys' fees and costs; (ii) property inspection and valuation fees; and (iii) other fees incurred to protect Lender's interest in the Property and/or rights under this Security Instrument or the Note; and (dd) take such action as Lender may reasonably require to assure that Lender's interest in the Property and/or rights under this Security Instrument or the Note, and Borrower's obligation to pay the sums secured by this Security Instrument or the Note, will continue unchanged.

Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (aaa) cash; (bbb) money order; (ccc) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (ddd) Electronic Fund Transfer. Upon Borrower's reinstatement of the Loan, this Security Instrument and obligations secured by this Security Instrument will remain fully effective as if no acceleration had occurred.

**21. Sale of Note.** The Note or a partial interest in the Note, together with this Security Instrument, may be sold or otherwise transferred one or more times. Upon such a sale or other transfer, all of Lender's rights and obligations under this Security Instrument will convey to Lender's successors and assigns.

**22. Loan Servicer.** Lender may take any action permitted under this Security Instrument through the Loan Servicer or another authorized representative, such as a sub-servicer. Borrower understands that the Loan Servicer or other authorized representative of Lender has the right and authority to take any such action.

The Loan Servicer may change one or more times during the term of the Note. The Loan Servicer may or may not be the holder of the Note. The Loan Servicer has the right and authority to: (a) collect Periodic Payments and any other amounts due under the Note and this Security Instrument; (b) perform any other mortgage loan servicing obligations; and (c) exercise any rights under the Note, this Security Instrument, and Applicable Law on behalf of Lender. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made, and any other information RESPA requires in connection with a notice of transfer of servicing.

**23. Notice of Grievance.** Until Borrower or Lender has notified the other party (in accordance with Section 16) of an alleged breach and afforded the other party a reasonable period after the giving of such notice to take corrective action, neither Borrower nor Lender may commence, join, or be joined to any judicial action (either as an individual litigant or a member of a class) that (a) arises from the other party's actions pursuant to this Security Instrument or the Note, or (b) alleges that the other party has breached any provision of this Security Instrument or the Note. If Applicable Law provides a time period that must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this Section 23. The notice of Default given to Borrower pursuant to Section 26(a) and


**RECORDER**

CERTIFIED COPY, THIS
DOCUMENT IS A TRUE AND
CORRECT COPY OF THE
RECORDED DOCUMENT MINUS
ANY REDACTED PORTIONS

the notice of acceleration given to Borrower pursuant to Section 19 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 23.

**24. Hazardous Substances.**

**(a) Definitions.** As used in this Section 24: (i) "Environmental Law" means any Applicable Laws where the Property is located that relate to health, safety, or environmental protection; (ii) "Hazardous Substances" include (A) those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law, and (B) the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, corrosive materials or agents, and radioactive materials; (iii) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (iv) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

**(b) Restrictions on Use of Hazardous Substances.** Borrower will not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower will not do, nor allow anyone else to do, anything affecting the Property that: (i) violates Environmental Law; (ii) creates an Environmental Condition; or (iii) due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects or could adversely affect the value of the Property. The preceding two sentences will not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

**(c) Notices; Remedial Actions.** Borrower will promptly give Lender written notice of: (i) any investigation, claim, demand, lawsuit, or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge; (ii) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release, or threat of release of any Hazardous Substance; and (iii) any condition caused by the presence, use, or release of a Hazardous Substance that adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower will promptly take all necessary remedial actions in accordance with Environmental Law. Nothing in this Security Instrument will create any obligation on Lender for an Environmental Cleanup.

**25. Electronic Note Signed with Borrower's Electronic Signature.** If the Note evidencing the debt for this Loan is electronic, Borrower acknowledges and represents to Lender that Borrower: (a) expressly consented and intended to sign the electronic Note using an Electronic Signature adopted by Borrower ("Borrower's Electronic Signature") instead of signing a paper Note with Borrower's written pen and ink signature; (b) did not withdraw Borrower's express consent to sign the electronic Note using Borrower's Electronic Signature; (c) understood that by signing the electronic Note using Borrower's Electronic Signature, Borrower promised to pay the debt evidenced by the electronic Note in accordance with its terms; and (d) signed the electronic Note with Borrower's Electronic Signature with the intent and understanding that by doing so, Borrower promised to pay the debt evidenced by the electronic Note in accordance with its terms.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**26. Acceleration; Remedies.**

**(a) Notice of Default.** Lender will give a notice of Default to Borrower prior to acceleration following Borrower's Default, except that such notice of Default will not be sent when Lender exercises its right

**NEVADA** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** **(MERS)** **Form 3029** 07/2021
ICE Mortgage Technology, Inc.                    Page 17 of 19                    NV21EDEDL 0222
                                                                                NVEDEDL (CLS)

Certification Date: 12/30/2024 10:37 AM                    Page 17 of 24



RECORDER
Debbie Conway

CERTIFIED COPY, THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE RECORDED DOCUMENT MINUS ANY REDACTED PORTIONS

under Section 19 unless Applicable Law provides otherwise. The notice will specify, in addition to any other information required by Applicable Law: (i) the Default; (ii) the action required to cure the Default; (iii) a date, not less than 30 days (or as otherwise specified by Applicable Law) from the date the notice is given to Borrower, by which the Default must be cured; (iv) that failure to cure the Default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property; (v) Borrower's right to reinstate after acceleration; and (vi) Borrower's right to bring a court action to deny the existence of a Default or to assert any other defense of Borrower to acceleration and sale.

**(b) Acceleration; Power of Sale; Expenses.** If the Default is not cured on or before the date specified in the notice, Lender without further demand, may invoke the power of sale, including the right to accelerate full payment of the Note, and any other remedies permitted by Applicable Law. Lender will be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 26, including, but not limited to: (i) reasonable attorneys' fees and costs; (ii) property inspection and valuation fees; and (iii) other fees incurred to protect Lender's interest in the Property and/or rights under this Security Instrument unless prohibited by Applicable Law.

**(c) Notice of Sale; Sale of Property.** If Lender invokes the power of sale, Lender or its agent will execute or cause Trustee to execute written notice of the occurrence of an event of Default and of Lenders' election to cause the Property to be sold, and will cause such notice to be recorded in each county in which any part of the Property is located. Lender, its agent, or the Trustee will mail copies of the notice as prescribed by Applicable Law to Borrower and to the other required recipients. Trustee will give public notice of sale to the persons and in the manner prescribed by Applicable Law. At a time permitted by, and in accordance with Applicable Law, Trustee, without further demand on Borrower, will sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may submit a credit bid and may purchase the Property at any sale.

**(d) Trustee's Deed; Proceeds of Sale.** Trustee will deliver to the purchaser a Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed will be prima facie evidence of the truth of the statements made in that deed. Trustee will apply the proceeds of the sale in the following order: (i) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees and costs; (ii) to all sums secured by this Security Instrument; and (iii) any excess to the parties legally entitled to it.

**27. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender will request Trustee to reconvey the Property and will surrender this Security Instrument and all Notes evidencing the debt secured by this Security Instrument to Trustee. Upon such request, Trustee will reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons will pay any recordation costs associated with such reconveyance. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**28. Substitute Trustee.** Lender may, from time to time, by itself or through the Loan Servicer, remove Trustee and appoint a successor trustee to any Trustee appointed under this Security Instrument. Without conveyance of the Property, the successor trustee will succeed to all the rights, title, power, and duties conferred upon Trustee in this Security Instrument and by Applicable Law.

**29. Assumption Fee.** If there is an assumption of this Loan, Lender may charge an assumption fee of U.S.

**30. Attorneys' and Others' Fees.** Lender will be entitled to recover its reasonable attorneys' fees and costs and any other fees and costs associated with the enforcement of this Security Instrument,

NEVADA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   (MERS)   **Form 3029**   07/2021
ICE Mortgage Technology, Inc.                    Page 18 of 19                    NV21EDEDL   0222
                                                                                 NVEDEDL (CLS)



**RECORDER**

CERTIFIED COPY, THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE RECORDED DOCUMENT MINUS ANY REDACTED PORTIONS

**Certification Date: 12/30/2024 10:37 AM**          Page 18 of 24

including but not limited to, foreclosure trustee and sheriff's fees and costs, in any action or proceeding to construe or enforce any term of this Security Instrument unless prohibited or restricted by Applicable Law. The term "attorney's fees," whenever used in this Security Instrument, includes without limitation, attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider signed by Borrower and recorded with it.

_____   12\12\2024 (Seal)
THU THUY NGUYEN                                                                              DATE

State of ___Nevada___

County of ___Clark___

This instrument was acknowledged before me on ___12\12\2024___ (date) by THU THUY NGUYEN.

(Seal, if any)

> SANDRA B TRUJILLO-POMPA
> Notary Public, State of Nevada
> Appointment No. 17-1739-1
> My Appt. Expires Apr 5, 2025

_____
(Signature of notarial officer),
Notary Public
(Title and rank)

Lender: PennyMac Loan Services, LLC
NMLS ID: 35953
Loan Originator: Brandon Glenn
NMLS ID: 375196



**RECORDER**

CERTIFIED COPY, THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE RECORDED DOCUMENT MINUS ANY REDACTED PORTIONS

**Certification Date: 12/30/2024 10:37 AM**          Page 19 of 24

CERTIFIED COPY, THIS
DOCUMENT IS A TRUE AND
CORRECT COPY OF THE
RECORDED DOCUMENT MINUS
ANY REDACTED PORTIONS

# EXHIBIT "A"

All that certain real property situated in the County of Clark, State of Nevada, described as follows:

Parcel One:
Lot 93, Meranto/Grand Canyon Phase 2, as shown by map thereof on file in Book 170 of Plats, Page 9 in the Office of the County Recorder of Clark County, Nevada. Amended by Certificate of Amendment Recording Date: March 5, 2024, Recording No: Book 20240305, Instrument No. 20240305, of Official Records

Parcel Two:
A non-exclusive easement for ingress, egress, use and enjoyment and public utility purposes on, over and across the private streets and common area on the map referenced hereinabove, which easement is appurtenant to Parcel One.

Assessor's Parcel Number: 176-19-316-010



Debbie Conway
**RECORDER**

MIN: 1007159-7002055120-4

## PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **12th** day of **December, 2024** and is incorporated into and amends and supplements the Mortgage, Mortgage Deed, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to **PennyMac Loan Services, LLC, a Delaware Limited Liability Company**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at: **9878 Belikove Manor Ave, Las Vegas, NV 89178.**

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in **COVENANTS, CONDITIONS AND RESTRICTIONS**

(the "Declaration").
The Property is a part of a planned unit development known as **Meranto Grand Canyon**

**MULTISTATE PLANNED UNIT DEVELOPMENT RIDER – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
**Form 3150** 07/2021
ICE Mortgage Technology, Inc.                  Page 1 of 4                  F3150v21RLU  0322
                                                                           F3150RLU (CLS)



**RECORDER**

CERTIFIED COPY, THIS
DOCUMENT IS A TRUE AND
CORRECT COPY OF THE
RECORDED DOCUMENT MINUS
ANY REDACTED PORTIONS

**Certification Date: 12/30/2024 10:37 AM**          **Page 21 of 24**

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits, and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the representations, warranties, covenants, and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower will perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of incorporation, trust instrument, or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower will promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes, winds, and floods, for which Lender requires insurance, then (i) Lender waives the provision in Section 3 for the portion of the Periodic Payment made to Lender consisting of the yearly premium installments for property insurance on the Property, and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower will give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

**MULTISTATE PLANNED UNIT DEVELOPMENT RIDER** – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
**Form 3150** 07/2021
ICE Mortgage Technology, Inc.                    Page 2 of 4                    F3150v21RLU  0322
                                                                                                F3150RLU (CLS)

**RECORDER**
**Debbie Conway**
CERTIFIED COPY, THIS
DOCUMENT IS A TRUE AND
CORRECT COPY OF THE
RECORDED DOCUMENT MINUS
ANY REDACTED PORTIONS



In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and will be paid to Lender. Lender will apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower will take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and will be paid to Lender. Such proceeds will be applied by Lender to the sums secured by the Security Instrument as provided in Section 12.

**E. Lender's Prior Consent.** Borrower will not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents unless the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F will become additional debt of Borrower secured by the Security Instrument. Unless

**MULTISTATE PLANNED UNIT DEVELOPMENT RIDER – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
**Form 3150   07/2021**
ICE Mortgage Technology, Inc.                    Page 3 of 4                    F3150v21RLU   0322
                                                                               F3150RLU (CLS)



**RECORDER**

CERTIFIED COPY, THIS
DOCUMENT IS A TRUE AND
CORRECT COPY OF THE
RECORDED DOCUMENT MINUS
ANY REDACTED PORTIONS

Borrower and Lender agree to other terms of payment, these amounts will bear interest from the date of disbursement at the Note rate and will be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ 12\12\2024 _____ (Seal)
THU THUY NGUYEN                                      DATE

MULTISTATE PLANNED UNIT DEVELOPMENT RIDER – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
**Form 3150**  07/2021
ICE Mortgage Technology, Inc.              Page 4 of 4              F3150v21RLU  0322
                                                                    F3150RLU (CLS)

**Certification Date: 12/30/2024 10:37 AM**        Page 24 of 24





Debbie Conway
**RECORDER**

CERTIFIED COPY, THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE RECORDED DOCUMENT MINUS ANY REDACTED PORTIONS

# Exhibit B: Certified Bargain and Sale Deed

Blockchain ID: 0x7b3bc61ed2e117cd70f253140615e59a7ced66d3



## DEBBIE CONWAY
### Clark County Recorder

**CONTACT**
**Office of the County Recorder**
**Clark County, Nevada**
(702) 455-4336
RecWeb@ClarkCountyNV.gov

INST: 202412120000655

## OFFICIAL CLARK COUNTY TITAN SEAL

### About this seal:

https://www.clarkcountynv.gov/government/elected_officials/county_recorder/titanseal.php

### Verify digital version:

https://titanseal.com/verify

Make sure there are 9 pages, including this one.



U.S. Pat.: 11,138,590 EU Pat.: EP3495983B1

I, Debbie Conway, hereby certify this document as a true and correct copy of the original on record with the Clark County Recorder's office.

Debbie Conway, Clark County Recorder

December 30, 2024

Date

Per Nevada Revised Statute 239 Section 6, personal information may be redacted, but in no way affects the legality of the document.

OFFICIAL USE ONLY:
https://clerk.titanseal.com/address/0x7b3bc61ed2e117cd70f253140615e59a7ced66d3

APN/Parcel ID(s): 176-19-316-010

Order No.: 240152556-DA

**WHEN RECORDED MAIL TO and MAIL TAX STATEMENTS TO:**

Thu Thuy Nguyen
9878 Belikove Manor Ave
Las Vegas, NV 89178

Inst #: **20241212-0000655**
Fees: **$42.00**
RPTT: **$4008.60  Ex #:**
12/12/2024 10:39:01 AM
Receipt #: 5761835
Requestor:
**Ticor Title of Nevada**
Recorded By: LOURAM   Pgs: 8
**Debbie Conway**
**CLARK COUNTY RECORDER**
Src: ERECORD
Ofc: ERECORD

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## GRANT, BARGAIN AND SALE DEED

R.P.T.T $4,008.60

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**Richmond American Homes of Nevada, Inc., A Colorado Corporation,**

do(es) hereby GRANT, BARGAIN AND SELL to

**Thu Thuy Nguyen, An Unmarried Woman**

the real property situated in the County of Clark, State of Nevada, described as follows:

FOR LEGAL DESCRIPTION OF THE REAL PROPERTY, SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

WITH REFERENCE TO ALTERNATIVE DISPUTE RESOLUTION, SEE ADDENDUM A ATTACHED HERETO AND MADE A PART HEREOF.

Subject to:

1.  All general and special taxes for the current fiscal year.

2.  Covenants, Conditions, Restrictions, Reservations, Rights, Rights of way and Easements now of record.

Together with all tenements, hereditaments and appurtenances, including easements and water rights, if any, thereto belonging or appertaining, and any revisions, remainders, rents, issues or profits thereof.

Grant Bargain and Sale Deed
SCA0002455.doc / Updated: 07.19.22

NV-CT-FANV-01313.420015-240152556


**RECORDER**


CERTIFIED COPY, THIS
DOCUMENT IS A TRUE AND
CORRECT COPY OF THE
RECORDED DOCUMENT MINUS
ANY REDACTED PORTIONS

**Certification Date: 12/30/2024 10:37 AM**          **Page 1 of 8**

SIGNATURES AND NOTARY ACKNOWLEDGEMENT FOR GRANT, BARGAIN, SALE DEED

RICHMOND AMERICAN HOMES OF NEVADA, INC.,

a Colorado corporation

By: _____

Winter Buonfiglio-Bruschi, Authorized Agent

STATE OF NEVADA        } ss:
COUNTY OF CLARK

This instrument was acknowledged before me on **December 11, 2024**, by
WINTER BUONFIGLIO-BRUSCHI, Authorized Agent

_____
D. AUGIENELLO, Notary Public

> D. AUGIENELLO
> Notary Public, State of Nevada
> No. 17-3133-1
> My Appt. Exp. July 19, 2025



**RECORDER**

CERTIFIED COPY, THIS
DOCUMENT IS A TRUE AND
CORRECT COPY OF THE
RECORDED DOCUMENT MINUS
ANY REDACTED PORTIONS

**Certification Date: 12/30/2024 10:37 AM**          Page 2 of 8

# EXHIBIT "A"

All that certain real property situated in the County of Clark, State of Nevada, described as follows:

Parcel One:
Lot 93, Meranto/Grand Canyon Phase 2, as shown by map thereof on file in Book 170 of Plats, Page 9 in the Office of the County Recorder of Clark County, Nevada. Amended by Certificate of Amendment Recording Date: March 5, 2024, Recording No: Book 20240305, Instrument No. 20240305, of Official Records

Parcel Two:
A non-exclusive easement for ingress, egress, use and enjoyment and public utility purposes on, over and across the private streets and common area on the map referenced hereinabove, which easement is appurtenant to Parcel One.

Assessor's Parcel Number:  176-19-316-010



Debbie Conway
RECORDER

CERTIFIED COPY, THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE RECORDED DOCUMENT MINUS ANY REDACTED PORTIONS

**Certification Date: 12/30/2024 10:37 AM**          Page 3 of 8





*Alternative Dispute Resolution*

*Addendum A*

*Deed of Conveyance*

This is an Addendum to and forms part of the document that conveys title to the property from Grantor to Grantee (the "Deed"). Grantor is also referred to herein as Seller and Grantee is also referred to herein as Buyer.

1.   <u>Dispute</u>. For purposes of this Addendum "Dispute" shall mean and include, without limitation, any and all controversies, disputes or claims arising out of, related to, or in any way connected with the Property, the purchase agreement, or any resulting transaction, including without limitation claims relating to construction defects arising under or pursuant to state statutes relating to construction defects; personal injury or property damage alleged to have been sustained by Buyer, Buyer's family, other occupants of the Property, and/or invitees to the Property; or any other circumstances relating to, of, or concerning the Property.

2.   <u>Mediation</u>. Buyer agrees to personally and individually (*i.e.* without serving as a class representative for others, or becoming a member of a class action commenced by others, with respect to the Dispute) mediate any Dispute with Seller before resorting to arbitration. Any mediation shall be in the State in which the Property is located.

2.1        Mediation is a process in which the parties attempt to resolve a Dispute by discussing the Dispute in the presence of an impartial, neutral third party authorized by the parties to facilitate the resolution of the Dispute ("Mediator"). The Mediator is not empowered to impose a settlement on the parties. The parties shall agree upon a Mediator within 30 days of written notice of a Dispute delivered by one party to the other. Delivery of a notice of Dispute shall be in accordance with the notice provisions of the Purchase Agreement. If the parties cannot agree upon the selection of a Mediator within such time period, the parties shall request JAMS, Judicial Arbiter Group, Inc. or another mutually acceptable dispute resolution service provider (as selected, the "ADR Provider") to appoint a Mediator to conduct the mediation.

2.2        All mediation fees, costs and expenses shall be divided equally among the parties; provided, however, that Seller shall be responsible for the first four (4) hours of the Mediator's time. Before the mediation begins and consistent with the laws of the State in which the Property is located, the parties shall agree in writing to limit the admissibility in any arbitration or court action of anything said, any admission made, and any documents prepared in the course of the mediation.

2.3        If any party commences an arbitration or court proceeding based on a Dispute without first attempting to resolve the matter through mediation, the other party shall have the right, at any time, to cause such proceeding to be dismissed or set aside, and the commencing party shall pay all costs, expenses and reasonable attorney fees incurred by such party to have such proceeding set aside or dismissed or stayed.



*Debbie Conway*
**RECORDER**

CERTIFIED COPY, THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE RECORDED DOCUMENT MINUS ANY REDACTED PORTIONS



3.  <u>Arbitration of Disputes</u>. The parties agree that this transaction involves interstate commerce and that any Dispute not settled during mediation shall be governed procedurally, resolved, enforced, compelled, stayed, and confirmed by binding arbitration as provided in the Federal Arbitration Act (9 U.S.C. §§1 et seq.) (the "FAA"). Such arbitration shall be conducted by the ADR Provider selected by the parties, which ADR Provider may be different than the ADR Provider that conducted the mediation, and such Dispute shall not be resolved by or in a court of law or equity. Buyer agrees to personally and individually (*i.e.* without serving as a class representative for others, or becoming a member of a class action commenced by others, with respect to the Dispute) arbitrate such Dispute. A written notice of the intent to arbitrate such Dispute shall be delivered by the party desiring to arbitrate such Dispute to the other party within 30 days after the conclusion of the mediation, and otherwise in accordance with the notice provisions in the Purchase Agreement. Any arbitration shall be in the State in which the Property is located.

3.1  Except as may otherwise be expressly stated in the Deed, unless the parties agree otherwise, the arbitration shall be conducted generally in accordance with the rules specified by the ADR Provider (the "Rules"), but which Rules must include, and it is the express intent of Buyer and Seller that each shall be bound by, the following:  The arbitration shall be conducted by a single arbitrator agreed upon by the parties with at least 10 years of experience in the subject matter of the Dispute who may be, without limitation, an attorney licensed to practice law in the State in which the Property is located with experience in real estate or construction law, or an expert in the construction industry ("Arbitrator"). If the parties cannot agree upon the selection of an Arbitrator, the Arbitrator shall be selected by the Chief Judge of the judicial district in which the Property is located, or shall otherwise be selected in the manner provided by applicable law and/or custom, and shall meet the foregoing criteria. An Arbitrator shall be selected within the shortest possible period after delivery of the written notice of intent to arbitrate the Dispute. Any fees due to the ADR Provider in connection with such selection process shall be split equally by the Buyer and Seller. If the amount claimed with respect to the Dispute exceeds $1,000,000, the arbitration shall be heard and determined by three Arbitrators, unless the parties agree on a single Arbitrator. If three Arbitrators are to hear the Dispute, Buyer and Seller shall each select an Arbitrator of their choice and those two Arbitrators shall agree on the selection of the third Arbitrator.

3.1.1   The Arbitrator shall have exclusive authority to resolve any Dispute, including, but not limited to any claim that all or any part of the purchase agreement or any addenda or amendment is void or voidable. The Arbitrator's authority is limited to resolution of the Dispute, and other claims may not be joined or consolidated with the Dispute unless agreed to in writing by all parties. In any such proceedings, the Arbitrator shall apply the substantive law of the State in which the Property is located, saving and excepting any laws regarding arbitration procedure and its enforcement, including, but not limited to, compelling arbitration, staying arbitration, enforcement/confirmation of arbitration awards, and review/appeal of arbitration rulings, which shall remain governed by the provisions of the FAA. The Arbitrator shall be authorized to provide all recognized remedies available at law for any cause of action, except injunctive relief or specific performance. The Arbitrator shall make a determination of the Dispute after completion of the arbitration proceeding. The parties agree that the Arbitrator's decision shall be final and binding. To the fullest extent permitted by applicable law, Buyer and Seller agree that no finding or stipulation of fact, no conclusion of law, and no arbitration award in any arbitration shall be given preclusive or collateral estoppel effect with respect to any issue or claim in any subsequent arbitration or court action, except among the parties to the arbitration.

3.1.2  Judgment upon the award rendered by the Arbitrator may be entered in any court having jurisdiction. The forum for enforcement or any related review of any award or decision rendered by the Arbitrator shall be the United States District Court in which the Property is located.

*Debbie Conway*
**RECORDER**

CERTIFIED COPY, THIS
DOCUMENT IS A TRUE AND
CORRECT COPY OF THE
RECORDED DOCUMENT MINUS
ANY REDACTED PORTIONS



3.2    IN THE EVENT THAT ARBITRATION FAILS FOR ANY PURPOSE, THE PARTIES, TO THE FULLEST EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVE, RELINQUISH AND FOREVER FORGO THE RIGHT TO TRY ANY SUCH DISPUTE BEFORE A JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THE PURCHASE AGREEMENT OR THE PROPERTY SOLD HEREBY OR ANY CONDUCT, ACT OR OMISSION OF SELLER, OR ANY OF ITS DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH SELLER AND SUCH DISPUTES SHALL BE RESOLVED IN THAT EVENT ONLY IN A TRIAL BEFORE A JUDGE IN A COURT OF APPROPRIATE JURISDICTION.

3.3    ANY RIGHT OR CLAIM BETWEEN BUYER AND SELLER SHALL NOT BE PROSECUTED BY OR IN THE NAME OF A HOMEOWNER'S OR PLANNED COMMUNITY ASSOCIATION OR ANY OTHER THIRD PARTY AND SUCH RIGHT OR CLAIM MAY ONLY BE PROSECUTED IN THE NAME OF THE OWNER OF THE PROPERTY. BUYER COVENANTS AND AGREES THAT IT SHALL NOT PARTICIPATE IN NOR ALLOW A HOMEOWNER'S OR PLANNED COMMUNITY ASSOCIATION OR ANY OTHER THIRD  PARTY TO PURSUE, DIRECTLY OR INDIRECTLY, ANY CLAIM OR RIGHT ON BEHALF OF A BUYER, BY ASSIGNMENT OR OTHERWISE.

4.    Severability/Additional Parties. The waiver or invalidity of any portion of this Addendum shall not affect the validity or enforceability of the remaining portions of this Addendum. Buyer and Seller agree: (a) any Dispute involving Seller's affiliates, directors, officers, employees, subcontractors, design professionals, and/or agents shall also be subject to mediation and arbitration as described in this Addendum, and shall not be pursued in a court of law or equity; and (b) Seller may, at its sole election join and include Seller's contractors, subcontractors, design professionals and/or suppliers, as well as any warranty company, insurer or other necessary or proper party, as parties in the mediation and arbitration notwithstanding any contrary provision and regardless of whether Buyer or Seller initiates a claim against the contractors, design professionals, subcontractors and/or suppliers.

5.    Attorney Fees/Costs. Each party shall bear its own costs and expenses, expert witness fees, arbitration costs and any fees in any Dispute, including attorneys' fees, and neither party shall be entitled to or awarded its attorney fees or costs incurred with respect to any Dispute.

6.    Time for Filing/Location. In no event shall the Dispute be submitted for mediation or arbitration after the date when institution of a legal or equitable proceeding based on the underlying claims in such Dispute would be barred by the applicable statute of limitations or statute of repose. Arbitration proceedings shall be conducted in the jurisdiction where the Property is located.

7.    Injunctive Relief. Notwithstanding anything in this Addendum to the contrary, if either Seller or Buyer seeks injunctive relief, and not monetary damages, from a court because irreparable damage or harm would otherwise be suffered by either party before mediation or arbitration could be conducted, such action shall not be interpreted to indicate or be deemed to be a waiver of the right to mediate or arbitrate.

8.    Binding Effect. THE AGREEMENT TO MEDIATE AND/OR ARBITRATE ANY DISPUTE WITH GRANTOR (SELLER) REGARDING THE PROPERTY SHALL BE A COVENANT RUNNING WITH THE LAND AND GRANTEE (BUYER) AGREES THIS ADDENDUM APPLIES TO GRANTEE'S (BUYER'S) PERSONAL REPRESENTATIVES, HEIRS, SUCCESSORS SUBSEQUENT GRANTEES AND ASSIGNS, AND GRANTEE (BUYER) INTENDS THAT ALL SUCH PARTIES SHALL BE BOUND HEREBY.

Debbie Conway
RECORDER

CERTIFIED COPY, THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE RECORDED DOCUMENT MINUS ANY REDACTED PORTIONS



9.    WAIVER OF CLASS ACTION. BUYER WAIVES THE RIGHT FOR ANY DISPUTE TO BE COMMENCED, HEARD OR RESOLVED AS A CLASS ACTION. BUYER AND SELLER EACH HEREBY WAIVE AND AGREE NOT TO ASSERT ANY CLASS ACTION OR REPRESENTATIVE ACTION CLAIMS AGAINST THE OTHER IN MEDIATION, ARBITRATION OR OTHERWISE, AND AGREE THAT IT IS THE EXPRESS INTENT OF EACH PARTY THAT CLASS ACTION AND REPRESENTATIVE ACTION PROCEDURES NOT BE ASSERTED OR APPLIED WITH RESPECT TO ANY DISPUTE.

10.    AGREEMENT TO MEDIATE AND ARBITRATE. BUYER AND SELLER AGREE TO HAVE ANY DISPUTE RESOLVED BY MEDIATION, AND IF NOT RESOLVED BY MEDIATION, DECIDED BY ARBITRATION IN ACCORDANCE WITH THE PROVISIONS OF THIS ADDENDUM. BUYER ACKNOWLEDGES THAT ABSENT THE PROVISIONS OF THIS ADDENDUM, SELLER WOULD NOT HAVE ENTERED INTO THE PURCHASE AGREEMENT. THE FAILURE BY SELLER TO TIMELY DEMAND MEDIATION OR ARBITRATION HEREUNDER, INCLUDING WITHOUT LIMITATION IF BUYER COMMENCES AN ARBITRATION OR COURT PROCEEDING BASED ON A DISPUTE WITHOUT FIRST ATTEMPTING TO RESOLVE THE MATTER THROUGH MEDIATION AND/OR ARBITRATION, SHALL NOT BE DEEMED A WAIVER BY SELLER OF ITS RIGHT AND ABILITY TO DEMAND MEDIATION AND/OR ARBITRATION UNDER THIS ADDENDUM.

11.    WAIVER OF JURY TRIAL. SUBJECT TO THE PROVISIONS OF THIS SECTION AND SECTION 3.2 OF THIS ADDENDUM, BUYER AND SELLER EXPRESSLY WAIVE THE RIGHT TO HAVE ANY DISPUTE HEARD OR RESOLVED IN A COURT BY A JUDGE OR JURY. IF FOR ANY REASON A PARTICULAR DISPUTE IS NOT SUBJECT TO THE MEDIATION OR THE ARBITRATION PROVISIONS SET FORTH ABOVE, BUYER AND SELLER AGREE SUCH DISPUTE SHALL BE HEARD BY A JUDGE IN A COURT PROCEEDING AND NOT A JURY.



RECORDER

CERTIFIED COPY, THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE RECORDED DOCUMENT MINUS ANY REDACTED PORTIONS

**STATE OF NEVADA**
**DECLARATION OF VALUE**

1. Assessor's Parcel Number(s)
   a. 176-19-316-010 _____
   b. _____
   c. _____
   d. _____

2. Type of Property:
   a. ☐ Vacant Land     b. ☒ Single Fam. Res.
   c. ☐ Condo/Twnhse    d. ☐ 2-4 Plex
   e. ☐ Apt. Bldg       f. ☐ Comm'l/Ind'l
   g. ☐ Agricultural    h. ☐ Mobile Home
      ☐ Other _____

| FOR RECORDERS OPTIONAL USE ONLY |
| Book_____ Page: _____ |
| Date of Recording: _____ |
| Notes: |

3. a. Total Value/Sales Price of Property     $ 785,950.00 _____
   b. Deed in Lieu of Foreclosure Only (value of property)  ( _____ )
   c. Transfer Tax Value:     $ 785,950.00 _____
   d. Real Property Transfer Tax Due     $ 4,008.60 _____

4. **If Exemption Claimed:**
   a. Transfer Tax Exemption per NRS 375.090, Section    NONE
   b. Explain Reason for Exemption: _____
   _____

5. Partial Interest: Percentage being transferred:   100.00% _____

The undersigned declares and acknowledges, under penalty of perjury, pursuant to NRS 375.060 and NRS 375.110, that the information provided is correct to the best of their information and belief, and can be supported by documentation if called upon to substantiate the information provided herein. Furthermore, the parties agree that disallowance of any claimed exemption, or other determination of additional tax due, may result in a penalty of 10% of the tax due plus interest at 1% per month. Pursuant to NRS 375.030, the Buyer and Seller shall be jointly and severally liable for any additional amount owed.

Signature _____   Capacity: Grantor _____

Signature _____   Capacity: Grantee _____

| **SELLER (GRANTOR) INFORMATION** | **BUYER (GRANTEE) INFORMATION** |
| **(REQUIRED)** | **(REQUIRED)** |

Print Name: Richmond American Homes of Nevada, Inc.          Print Name: Thu Thuy Nguyen

Address: 770 E Warm Springs Rd, Suite 240     Address: 9878 Belikove Manor Ave
City: Las Vegas     City: Las Vegas
State: NV          Zip: 89119     State: NV          Zip: 89178

**COMPANY/PERSON REQUESTING RECORDING (Required if not seller or buyer)**

Print Name: Ticor Title of Nevada, Inc.     Escrow #     240152556
Address:     8363 W. Sunset Road, Suite 100
City:     Las Vegas     State: NV          Zip: 89113

AS A PUBLIC RECORD THIS FORM MAY BE RECORDED/MICROFILMED



Debbie Conway
**RECORDER**

CERTIFIED COPY, THIS
DOCUMENT IS A TRUE AND
CORRECT COPY OF THE
RECORDED DOCUMENT MINUS
ANY REDACTED PORTIONS